410 A.2d 344

# FEDERAL LAND BANK OF BALTIMORE

v.

## Philip Jay FETNER, Appellant.

Superior Court of Pennsylvania.

Argued March 19, 1979.

Filed Sept. 14, 1979.

Petition for Allowance of Appeal Denied Dec. 10, 1979.

Reargument Denied Jan. 9, 1980.

456

Paul R. Beckert, Jr., Fairless Hills, for appellant.

Paul L. Stevens, Morrisville, for appellee.

Before VAN der VOORT, HESTER and WIEAND, JJ.

VAN der VOORT, Judge:

This is an appeal from a decision of the Court of Common Pleas of Bucks County, sitting without a jury, in a mortgage foreclosure action, in favor of the plaintiff/appellee, Federal Land Bank of Baltimore (hereinafter, the Bank) and against defendant/appellant, Philip Jay Fetner (hereinafter, appellant or Fetner), in the sum of $137,194.45, plus interest and costs of foreclosure. Counterclaims by the appellant were dismissed. Appellant appeals both from the judgment against him and the dismissal of his Counterclaims.

The Bank's Complaint alleged that on October 9, 1974, Fetner borrowed the sum of $117,500 from it, secured by a mortgage of some twenty-five acres of improved land located in Nockamixon Township, Bucks County. The Complaint alleged that Fetner defaulted on the mortgage by failing to pay some $8,106.36 in monthly installments due from July 1, 1976 to February 1, 1977 and by failing to pay real estate taxes in the amount of $1,659.16. The Complaint recited that as a result of these defaults, the Bank was exercising its right to acceleration under the terms of the mortgage.

Judgment was demanded for unmatured principal, monthly installments due, interest, real estate taxes and attorney's commission, totalling $137,195.45.

Fetner filed Preliminary Objections to the Bank's Complaint which were dismissed after briefs were submitted. He then filed a 169-paragraph document which included his Answer, New Matter and numerous Counterclaims. The Counterclaims consisted of eleven counts and sought aggregate damages, compensatory and punitive, in excess of $5,000,000.

The Bank's claim that appellant was in default in his mortgage payments was established by undisputed evidence. In appellant's Answer, he claimed to have made a $2,000 payment for which he was not given credit, but he offered no proof in support of this averment. In any event, this would not have cured the default which has continued since July 1, 1976.

Appellant has averred that the provision for a 10% counsel fee in the mortgage bond is unconscionable. The test of such a fee must be its reasonableness, determined by the circumstances of each case. As this court said in *Foulke v. Hatfield Fair Grounds Bazaar, Inc.*, 196 Pa.Super. 155, 160, 173 A.2d 703, 706 (1969):

> The mortgagee, having loaned a fixed sum of money, should recover both the principal and interest without diminution for expenses which he may be forced to pay.

Certainly the circumstances of this case, involving preliminary objections, briefs, depositions, a trial and this appeal, each involving many of the issues tendered by the appellant in his Counterclaims make a fee of 10% of the mortgage quite reasonable, and probably not fully compensatory for the Bank's legal expenses. There was no other challenge to the amount of the judgment on foreclosure.

There remain for consideration the many issues raised in appellant's Counterclaims. Counterclaims are limited by Rule 1148 of the Pa.R.C.P. to those "which arise from the same transaction or occurrence or series of transactions or

occurrences from which the plaintiff's cause of action arose". The Counterclaim must have been a part of or incident to the creation of the mortgage itself, and this is to be read narrowly. *Mellon Bank N.A. v. Joseph*, 267 Pa.Super. 307, 406 A.2d 1055 (1979).

So tested, those which met the requirement of the rule amounted to averments that the Bank was guilty of fraud in the inducement of the mortgage. Averments in support of this claim of fraud were: (1) that Penn DOT had obtained an easement over a portion of the mortgaged property which was not disclosed to the appellant at or before the time of closing; (2) that appellant had been promised 80% mortgage financing which he did not receive; and (3) that appellant had been promised "lenient" treatment if he fell behind in his payments, but foreclosure followed a second default.

The background from which these allegations emerge is the negotiation between the appellant and Russell Albright, the local manager of the New Britian Branch of the Southeast Association, an organization which procured loan applications for submission to the Bank. Appellant testified that he told Albright that he had located a "gentleman's country estate and horse farm" on which he planned to sign an agreement to purchase in June, 1974. The purchase price was to be $180,000 and appellant requested 80% financing. Albright is said to have replied that he would recommend such a loan and that his recommendations had not been turned down by the Bank as yet. He did not say that he had authority to approve the loan.

At or about the same time, appellant, who is a lawyer, authorized a title search and in due course a preliminary title report was delivered to Albright which did not show the easement to Penn DOT. It was created at a later date and placed on record on October 1, 1974.

The closing took place on October 9, 1974 at which time the appellant executed the bond and mortgage in favor of the Bank as security for a loan of $117,000, the maximum the Bank would lend. He signed the documents and received the proceeds at that time. A final title report was on

hand at the time of the closing which showed the Penn DOT easement. This would appear to have been available to all parties at the closing, including the appellant, but it does not appear that he read it. There is no evidence that he did not understand the terms of the bond and mortgage.

In November, 1974, appellant lost his job and fell behind in his mortgage payments. The Bank threatened foreclosure but did not do so, and by March 1976 appellant became current in his payments. However, he did not pay the 1975–1976 school taxes on the property, and the Bank did so pursuant to authority vested in it under the terms of the mortgage. Appellant again fell behind in his monthly payments on July 1, 1976, and has made no payments since that date, although he has continued to occupy the property.

Attached to the appellant's Counterclaims were copies of Complaints filed against the sellers of the property, the estate of his real estate broker, two title insurance companies and Penn DOT, averring misrepresentations and fraud in the sale of the property, most of which are repeated in his Counterclaim against the Bank.

■ We deal first with the appellant's claim that the Bank fraudulently withheld from him knowledge of the fact that Penn DOT had obtained an easement over a portion of the property nine days before the closing. At the time appellant talked to Albright, the preliminary title report, which was then available, did not include the easement because it had then not been created. Appellant does not claim that the Bank or Albright reported to him that no easement existed; he simply contends that the Bank had a duty to tell him that the title report showed an easement in Penn DOT.

■ There is no basis for appellant's conclusion that the Bank or its mortgage procuring agent had any duty to search out defects in the title and disclose them to the appellant. Ordinarily, the relationship between the borrower and lender does not create a confidential relationship. *Grace et ux. v. Moll*, 285 Pa. 353, 355, 132 A. 171 (1926), and none was shown to exist in this case.

■ An action based upon concealment will not lie, even as between a vendor and vendee, unless there is established an affirmative duty to disclose the existence of a title defect. *American Metal Fabricators Company v. Goldman*, 227 Pa.Super. 284, 289, 323 A.2d 891, 894 (1974).

■ Ordinarily, there is no duty on the part of a lender to inspect the mortgaged property to determine that the borrower is obtaining that which he may have been promised by the vendor or that which he believes he is obtaining. Unless some further obligation is assumed, the lender's inspection of the premises to be mortgaged is made only to ascertain whether the property has sufficient value to secure the loan and is made by the lender for its benefit only.

Appellant did not contract with the Bank to review the title; he did not advise the Bank that he intended to rely on its inspection of the property; and no duty existed in law for the Bank to learn of or disclose any matter which appellant might deem a defect. If appellant was defrauded by the Penn DOT easement of which he avers he was unaware, the deception was not perpetrated by the Bank and appellant's remedy must be sought elsewhere.

■ It is equally clear that appellant was not defrauded by the representation of the Bank's agent that it would recommend 80% financing. Albright's assurance that he would recommend a mortgage in that amount and that his recommendations had never been turned down were no more than the opinion of an agent admittedly acting outside his authority. His power, at best, was only sufficient to allow him to recommend a loan to the Bank. See 12 U.S.C.A. § 2033(11). The Bank had the absolute right to refuse the mortgage terms requested by the appellant and recommended by its agent. *Todd v. Skelly*, 384 Pa. 423, 428, 120 A.2d 906, 909 (1956). Appellant had a remedy for the denial of his original application which he did not exercise. 12 U.S.C.A. § 2202. Finally, appellant voluntarily accepted the lesser 60% financing offered by the Bank, took its mortgage money and signed the bond and mortgage. Certainly, these

circumstances do not establish fraud in the inducement of the mortgage.

 The claim that appellant was promised "lenient" treatment in the event of a default is based upon a statement attributed to Albright in the preliminary negotiations to the effect that the Bank had a reputation for being lenient with its lenders. Even if Albright had the authority to commit the Bank, which he did not, this hardly amounted to a commitment that the Bank would not pursue its legal remedies if there was a default. In point of fact, the Bank did not foreclose when appellant went into default for the first time in 1975. It was not until appellant again fell behind in July 1976 and made no payment from then until March 1977 that the Bank foreclosed. There is no basis in fact or law for appellant's claim that he was entitled to leniency and did not receive it.

The remaining Counterclaims were either unsupported by any proffer of evidence, or related to transactions or occurrences which were not part of or incident to the mortgage loan, and therefore properly excluded from consideration by reason of Rule 1148 of the Pa.R.C.P. If any of them are actionable, it must be in an action not tied to this foreclosure as a Counterclaim.

 Finally, appellant claims that he was denied the right to make a final argument. The extent to which final argument may be permitted in a civil case is addressed to the discretion of the trial judge. *Commonwealth, ex rel. Friedman v. Friedman*, 223 Pa.Super. 66, 71, 297 A.2d 158, 160 (1972). We said in *Friedman* (223 Pa.Super. at p. 71, 297 A.2d at pp. 160–161), and it is equally appropriate here:

"'A matter such as the length of argument is, of course, almost entirely within the discretion of trial courts . . .' Here, an experienced trial judge, thoroughly familiar with the law governing the case, concluded that he had heard sufficient argument on the facts during the course of the hearing and any further argument would only be repetitious . . .

'. . . and we will not interfere with the discretion of the Court in the matter . . .' "

In the instant case, the trial court received and considered extensive briefs at the time the Preliminary Objections were ruled upon, and he permitted, indeed encouraged, discussion of the issues by counsel as the trial progressed. If, in his judgment, he had heard enough, we will not interfere.

Affirmed.